UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

BRENT LUYSTER,

                           Plaintiff,

        v.

RIC BISHOP, *et. al.*,

                          Defendants.

Case No. C18-6022-BHS-MLP

REPORT AND RECOMMENDATION

## I.    INTRODUCTION

This is a 42 U.S.C. § 1983 prisoner civil rights action. Brent Luyster ("Plaintiff"), proceeding *pro se*, filed a complaint alleging multiple violations of his First, Fourth, Eighth, and Fourteenth Amendment rights during his pretrial incarceration at the Clark County Jail ("CCJ") in Vancouver, Washington. (Pl.'s Compl. (Dkt. # 5) at 3.) A number of Plaintiff's claims were previously dismissed on Defendants' motion for judgment on the pleadings. (*See* dkt. ## 29, 32.) On February 5, 2021, Defendants filed a motion for summary judgment ("Defendants' Motion"), arguing Plaintiff's remaining claims fail as a matter of law and that Defendants are otherwise entitled to qualified immunity. (Defs.' Mot. (Dkt. # 44) at 1-2.) On May 6, 2021, Plaintiff filed his response (Pl.'s Resp. (dkt. # 50)), and on May 14, 2021, Defendants filed their reply (Defs.' Reply (dkt. # 53)).

Having considered the parties' submissions, the governing law, and the balance of the record, the Court recommends Defendants' Motion (dkt. # 44) be GRANTED in part, and DENIED in part, as further explained below.

## II.    BACKGROUND

### A.    Procedural History

On December 27, 2018, Plaintiff filed his complaint alleging claims against Defendants: (1) CCJ Chief Ric Bishop; (2) CCJ Correctional Commander Paul Dougher; (3) CCJ Correctional Commander Randy Tangen; (4) CCJ Correctional Commander Joe Barnett; (5) CCJ Correctional Sergeant Scott Gentry; (6) CCJ Correctional Sergeant Grant Austin; (7) CCJ Correctional Sergeant Ryan Ashworth; (8) CCJ Correctional Sergeant Christopher Anderson; (9) CCJ Correctional Sergeant Daniel Plotner; (10) CCJ Correctional Sergeant Daniel Schaub; and (11) CCJ Correctional Sergeant Chris Wolfe (collectively "Defendants"), in both their individual and official capacities, arising out of actions taken during Plaintiff's pretrial detention at the CCJ in 2017. (Pl.'s Compl. at ¶¶ 2-7.) On February 26, 2019, Defendants filed an answer. (Answer (Dkt. # 12).) On March 18, 2019, Defendants moved for judgment on the pleadings. (Dkt. # 17.)

On March 2, 2020, the Honorable Theresa L. Fricke, United States Magistrate Judge, issued a report and recommendation recommending that Defendants' motion for judgment on the pleadings be granted in part and denied in part, with leave to amend certain claims. (R. & R. (Dkt. # 29) at 37-39.) On July 20, 2020, the Honorable Benjamin H. Settle, United States District Judge, adopted Judge Fricke's report and recommendation. (Order (Dkt. # 32) at 5.) On October 23, 2020, this matter was referred to the undersigned, and on October 27, 2020, this Court granted Defendants an extension of the dispositive motion filing deadline. (Dkt. ## 40-41.)

On February 5, 2021, Defendants filed the instant Motion (Defs.' Mot.) in addition to declarations from CCJ Chief Bishop (Bishop Decl. (dkt. # 45)), Correctional Sergeant Gentry (Gentry Decl. (dkt. # 46)), and Correctional Commander Tangen (Tangen Decl. (dkt. # 47)). On March 1, 2021, the Court granted Plaintiff an extension of time to file a response due to his limited law library access at the Stafford Creek Corrections Center because of implemented COVID-19 emergency protocols. (Dkt. ## 48-49.) On May 6, 2021, Plaintiff filed his response (Pl.'s Resp.) with a declaration (Pl.'s Decl. (dkt # 51)) and a "Statement of Disputed Factual Issues" (dkt. # 52). On May 14, 2021, Defendants filed their reply. (Defs.' Reply.)

**B.    Factual Background**

Plaintiff was incarcerated in the CCJ from July 16, 2016, through December 15, 2017, awaiting trial on three counts of Aggravated First-Degree Murder with the use of a firearm, one count of Attempted First-Degree Murder with the use of a firearm, and one count of First-Degree and Second-Degree Unlawful Possession of a Firearm. (Bishop Decl. at ¶ 3; Pl.'s Decl. at ¶ 4.) Based on his criminal history and previous disciplinary history, Plaintiff was subject to enhanced security protocols and status upon his initial booking at the CCJ, requiring that two CCJ deputies be present for any interactions, and that he be transported in full restraints. (Bishop Decl. at ¶ 4; Pl.'s Decl. at ¶ 5.) After a July 16, 2016, incident in which Plaintiff removed screws from an electrical outlet in an attempt to set fire to his cell, Plaintiff was subject to a requirement that three CCJ deputies be present for any interactions, and to further enhanced security protocols while being transported. (Bishop Decl. at ¶ 6.)

On February 12, 2017, Plaintiff attempted to escape, or otherwise breach the CCJ's security protocols. (Pl.'s Compl. at ¶ 8; Pl.'s Decl. at ¶¶ 10-15; Bishop Decl. at ¶ 7, Ex. A (Dkt. # 45-1) at 2-26, Ex. B (Dkt. # 45-2) at 2-4; Tangen Decl. at ¶¶ 6-7.) Plaintiff manipulated a

1    locking mechanism on the metal mesh covering his cell window and was able to break a fist-

2    sized hole in the security glass on the window that opened to a public walkway below. (Pl.'s

3    Decl. at ¶¶ 10-15; Bishop Decl. at ¶ 7, Ex. A at 2-12, Ex. B; Tangen Decl. at ¶ 7.) Upon

4    investigating, CCJ staff additionally found Plaintiff was in possession of a "fishing line,"a

5    makeshift rope with a hook on the end. (*Id.*) There was also evidence Plaintiff was also able to

6    successfully saw through a steel crossbar in his cell window, which Plaintiff disputes. (Tangen

7    Decl. at ¶ 15; Bishop Decl., Ex. A at 5-6; Pl.'s Decl. at ¶ 25.)

8        Defendants believed Plaintiff arranged for another individual to leave a weapon below his

9    cell window so that he could bring the weapon through the window with the makeshift rope to

10   escape the CCJ. (Tangen Decl. at ¶ 7.) Plaintiff does not dispute that he broke a hole in his cell

11   window. (Pl.'s Decl. at ¶¶ 10-15.) However, Plaintiff claims that he merely leveraged already

12   existing structural flaws in the window so that he could see outside and get fresh air. (*Id.* at ¶ 16.)

13   Plaintiff further disputes the use of the "fishing line" that was found in his cell and its ability to

14   bring a weapon into his cell. (*Id.* at ¶¶ 23-24.)

15        *i.    Step Program and Security Plan*

16        On February 23, 2017, as a result of the February 12, 2017 incident, Defendant Gentry

17   prepared an Administration Segregation Step Program ("Step Program") for Plaintiff's

18   behavioral modification. (Pl.'s Comp. at ¶ 45, Ex. A (Dkt. # 5-1) at 2-6; Bishop Decl. at ¶¶ 15,

19   18; Gentry Decl. (Dkt. # 46) at ¶¶ 3-5, Exs A-E (Dkt. # 46-1 – 46-5), Ex. G (Dkt. # 46-7), Exs.

20   I-L (Dkt. # 46-9 – 46-12), Exs. N-V (Dkt. # 46-14 – 46-22.) Plaintiff's Step Program outlined his

21   loss of privileges, use of nutraloaf, time out of his cell, visitation, and ability to keep items in his

22   cell based on his behavior, and it was regularly updated and modified based on Plaintiff's

23   behavior. (*Id.*)

CCJ Correctional Commander Tangen separately developed a security plan ("Security Plan") for Plaintiff with instructions to CCJ staff on how to securely handle Plaintiff whenever they interacted with him based on his attempts to thwart the CCJ's security. (Bishop Decl. at ¶ 16; Tangen Decl. at ¶¶ 8-9.) As such, the Security Plan outlined the frequency and use of strip searches, cell searches, cell moves, or use of restraints on Plaintiff. (*Id.*) The Security Plan was not provided to Plaintiff but was updated and reviewed based on his behaviors and infraction history. (Tangen Decl. at ¶¶ 9, 17.) Plaintiff's Step Program and Security Plan both remained in place until Plaintiff was transferred to the Washington State Department of Corrections' custody on December 15, 2017. (Bishop Decl. at ¶ 3.)

While housed at the CCJ, Plaintiff received approximately 30 infractions. (*See* Bishop Decl. at ¶¶ 17, 21.) Sixteen of his infractions resulted from Plaintiff either smearing feces in his cell, urinating in or outside of his cell, or otherwise creating some form of a biohazard in his cell. (*Id.*) Four of his infractions resulted from CCJ staff finding contraband in his cell. (*Id.*) Ten other infractions related to Plaintiff's behavioral actions toward CCJ staff. (*Id.*) Based on his infraction history, or periods of good behavior, Plaintiff's Step Program and status was adjusted in an effort to control or reward his behavior. (Pl.'s Compl., Ex. G at 31-32; Gentry Decl., Ex. F (Dkt. # 46-6) at 2, Ex. M (Dkt. # 46-13) at 2-3, Ex. W (Dkt. # 46-23) at 2.)

Plaintiff alleges Defendant Gentry informed him the Step Program and the strip searches were punishment and retaliation for his breach of security measures at the CCJ. (Pl.'s Compl. at ¶¶ 25, 45, 47, 130; Pl.'s Decl. at ¶ 33.) According to Plaintiff, the security breach "was on the front page of the newspaper, and that it caused a great deal of embarrassment and problems for the jail administration." (Pl.'s Compl. at ¶ 46.) Plaintiff states Defendant Gentry told him the

1  Step Program was "pay back" for the problems Plaintiff was causing. (*Id.* at ¶ 47; Pl.'s Decl. at

2  ¶ 47.)

3         1.   <u>Strip Searches</u>

4       As part of the Security Plan, Defendant Tangen authorized the use of routine and random

5  strip searches that were conducted by Defendants Gentry, Austin, Ashworth, Anderson, Plotner,

6  Schaub, and Wolfe. (Pl.'s Comp. at ¶¶ 13, 14, Ex. A at 2-4; Pl.'s Decl. at ¶¶ 31-32; Tangen Decl.

7  at ¶¶ 10-12.) Consequently, Plaintiff was subject to x-ray and cavity searches for contraband,

8  which were generally done three time a day at random, based on Plaintiff's history of hiding

9  contraband in his body. (Pl.'s Compl. at ¶ 9-10; Bishop Decl. at ¶¶ 9-11; Tangen Decl. at

10  ¶¶ 10-12.) Defendants claim Plaintiff was stripped immediately after the February 12, 2017

11  incident, and a ball bearing was found on the floor after he was requested to squat. (Bishop Decl.

12  at ¶ 9; Tangen Decl. at ¶ 12.) CCJ officers noted that it was similar in size and appearance to

13  those used in the anti-suicide towel holders at the CCJ. (Bishop Decl., Ex. A at 5-7, 16, 46.)

14  Plaintiff disputes that the ball bearing was secreted in his rectum and claims that the ball bearing

15  was instead merely found on the floor in his holding cell after he had been strip searched. (Pl.'s

16  Decl. at ¶¶ 17-20.) Over time, the frequency of the strip searches was reduced to one or less per

17  day. (Tangen Decl. at ¶ 10.)

18       Per Plaintiff, in conducting the strip searches, CCJ officers would enter his cell, handcuff

19  his hands behind his back, and order him to kneel at the center of the cell. (Pl.'s Compl. at

20  ¶¶ 26-27; Pl.'s Decl. at ¶¶ 34-35.) CCJ officers would then grab Plaintiff by the arms and hold

21  him in a chokehold while other officers shackled his legs together. (Pl.'s Compl. at ¶ 28; Pl.'s

22  Decl. at ¶¶ 34-35.) CCJ officers would then make Plaintiff walk to a dressing room where he was

23  forced to strip while handcuffed and shackled. (Pl.'s Compl. at ¶¶ 29-30; Pl.'s Decl. at ¶ 36.) A

CCJ officer would then use a metal detecting wand to scan Plaintiff's genitals and rectum before scanning his face. (Pl.'s Compl. at ¶ 31; Pl.'s Decl. at ¶ 37.) CCJ officers would then make Plaintiff squat over a mirror and cough several times. (Pl.'s Compl. at ¶¶ 32-35; Pl.'s Decl. at ¶ 38.)

Plaintiff notes that Defendants conducted half of these strip searches between 11:30 p.m. and 4:30 a.m. and often within 45 minutes of him having fallen asleep. (Pl.'s Compl. at ¶¶ 36-37; Pl.'s Decl. at ¶ 39.) Plaintiff alleges that he often awoke to Defendants banging on his cell door, shining flashlights into his eyes, and screaming commands for Plaintiff to stand for a search. (Pl.'s Compl. at ¶ 38; Pl.'s Decl. at ¶¶ 40-41.) Plaintiff reports he was often unable to sleep in anticipation of a night-time search and after the searches were conducted. (Pl.'s Compl. at ¶ 40; Pl.'s Decl. at ¶ 43.) Plaintiff claims that the searches never revealed any contraband present on his body. (Pl.'s Decl. at ¶ 45.)

Per Defendants, Plaintiff's strip searches were conducted within the definitions and guidance of RCW 10.79.070, *et seq.* pursuant to Plaintiff's Security Plan. (Bishop Decl. at ¶ 11.) Defendants allege that CCJ staff follow a flow chart that guides them through the criteria under which a strip search can be conducted, which includes the use of pat downs and metal detectors, and that only after satisfying these criteria may a strip search be conducted. (*Id.*) Defendants submit that Plaintiff's behaviors and ongoing manipulation of metal parts of his cell, possession of "fishing lines," and obstruction of cameras, satisfied the statutory requisites for routinely conducting the strip searches. (*Id.*)

From February 13, 2017, to March 1, 2017, Plaintiff alleges Defendants strip searched him approximately 36 times. (Pl.'s Compl. at ¶ 15-16; Pl.'s Decl. at ¶ 32.) By March 24, 2017, Plaintiff alleges Defendants had searched him at least 90 times. (Pl.'s Decl. at ¶ 32.) On March

1  24, 2017, after Plaintiff filed a grievance regarding the strip searches, Defendant Bishop

2  responded that while the strip searches were appropriate, they should be curtailed and only

3  conducted as facility security required. (Pl.'s Compl. at ¶ 22, Ex. H at 38.) Defendants then

4  reduced the amount of strip searches, but Plaintiff claims the searches continued until he left the

5  CCJ in December 2017. (Pl.'s Compl. at ¶ 24.)

6                  2.      <u>Visitation and Recreation Time</u>

7          Per the Step Program, Plaintiff was denied visits from friends and family and was only

8  permitted out of his cell for an hour every three days at step one. (Pl.'s Compl. at ¶¶ 49-50, Ex. A

9  at 2-4; Pl.'s Decl. at ¶¶ 50, 53; Bishop Decl. at ¶ 19, Ex. J (Dkt. # 45-10) at 2-22.) During his one

10 hour out, Plaintiff alleges he was confined to a room containing only a telephone and a shower.

11 (Pl.'s Compl. at ¶ 51.) Plaintiff alleges he was not allowed out of this room nor provided any

12 exercise or recreational equipment. (Pl.'s Compl. at ¶¶ 50-52, Ex. A at 2.) Specifically, Plaintiff

13 submits that he was only permitted access to recreation four times. (Pl.'s Decl. at ¶ 54.) Plaintiff

14 claims that the recreation area was also secure, within the line of sight of CCJ staff, and that it

15 was furnished with exercise equipment that he was denied use of. (*Id.* at ¶¶ 55-57.)

16         Defendants state that the CCJ does not have an outdoor recreation yard, but that there is

17 an open-air room where inmates are allowed to recreate based on security status, staffing levels,

18 and the individual inmate's behavior. (Gentry Decl. at ¶¶ 14-15.) Defendants note that Plaintiff

19 did not successfully work his way through the Step Program to the point that he could use the

20 open-air recreation room with regularity. (*Id.*)

21                 3.      <u>Personal Items and Hygiene</u>

22         As part of the Security Plan, Plaintiff was placed in a cell where video monitoring and

23 security checks were conducted every 15 minutes and his cell items were routinely searched for

any rips, tears, or contraband. (Pl.'s Compl. at ¶ 11; Pl.'s Decl. at ¶ 30; Bishop Decl. at ¶ 12; Tangen Decl. at ¶ 13.) The Step Program prohibited Plaintiff from possessing personal clothing, newspapers, magazines, photos, letters, writing materials, and books. (Pl.'s Compl. at ¶¶ 66-72, Ex. A at 2-4; Gentry Decl. at ¶ 6.) Plaintiff was permitted to read letters and use writing materials during his hour out. (Pl.'s Compl. at ¶¶ 69-70, Ex. A at 2-4.) Plaintiff's provided bedding was a bare mattress and a second suicide smock to use as a blanket. (Pl.'s Compl. at ¶¶ 81-82, Ex. A at 2-4; Pl.'s Decl. at ¶¶ 30, 50; Gentry Decl. at ¶ 6.) Plaintiff alleges the temperature in his cell would drop below 67 degrees Fahrenheit, which would cause his hands and feet to ache and his fingernails to turn blue and purple. (Pl.'s Compl. at ¶¶ 83-84, Ex. F at 28-29.)

Plaintiff alleges he was denied personal hygiene items pursuant to the Step Program. (Pl.'s Compl. at ¶¶ 73-78.) Plaintiff was only permitted access to soap and a towel during his one hour out. (*Id.* at ¶¶ 73-74, Ex. A at 2-4.) Plaintiff alleges he was not permitted to wash his hands after using the toilet or before meals. (*Id.* at ¶ 74.) Plaintiff alleges he was also not given a toothbrush in his cell and alleges he was often forced to go days and sometimes weeks without brushing his teeth. (*Id.* at ¶ 75, Ex. A 2-4.)

Defendants submit that Plaintiff could not have hygiene items, or any other personal items in his cell, because he could use those items to create contraband or weapons. (Gentry Decl. at ¶ 6.) Defendants note that Plaintiff's Step Program allowed him hygiene items in the presence of a CCJ deputy so that he could attend to his hygienic needs while he was in his cell. (*Id.*)

\\

\\

REPORT AND RECOMMENDATION - 9

1          4.     <u>Mental Health Treatment</u>

2          Plaintiff claims he began to develop serious mental health issues as a result of

3    Defendants' frequent strip searches, the Step Program, and his conditions of confinement. (Pl.'s

4    Compl. at ¶ 97; Pl.'s Decl. at ¶ 68.) Plaintiff states he routinely faced sleep deprivation. (Pl.'s

5    Decl. at ¶ 67.) Plaintiff claims the CCJ denied his request to see the medical staff regarding his

6    mental health concerns. (Pl.'s Compl. at ¶ 99; Pl.'s Decl. at ¶ 68.) Defendants assert Plaintiff was

7    routinely checked for medical and mental health concerns by CCJ providers because he was

8    housed in administrative segregation. (Bishop Decl. at ¶¶ 25-25, Ex. D (Dkt. # 45-4) at 2-24.)

9          On March 14, 2017, Plaintiff claims that he began suffering hallucinations due to extreme

10   sleep deprivation. (Pl.'s Compl. at ¶ 100; Pl.'s Decl. at ¶ 69.) Plaintiff claims he hallucinated

11   there was a hornet's nest in the smoke detector, and as a result, he began to cover the smoke

12   detectors, walls, and security cameras in his cell with his own feces. (Pl.'s Compl. at

13   ¶¶ 100-101.) Plaintiff alleges that, as punishment for this incident, Defendant Gentry ordered that

14   Plaintiff be kept in his cell without access to hygienic supplies, a second smock, or his one-hour

15   break, and that he be fed a nutraloaf diet. (Pl.'s Compl. at ¶ 102; Pl.'s Decl. at ¶ 70.)

16         Plaintiff alleges the CCJ did not provide him any mental health treatment despite his

17   requests for mental health care, and as a result, Plaintiff continued to suffer hallucinations and

18   smear feces in his cell. (Pl.'s Compl. at ¶¶ 103-04.) Based on his behavior, Plaintiff claims

19   Defendant Gentry confined him to his cell for 10 consecutive days—from April 10-20,

20   2017— with only his mattress and suicide smock which was still covered in feces. (*Id.* at ¶ 105;

21   Pl.'s Decl. at ¶ 71) During these 10 days, Plaintiff was placed on a nutraloaf diet, and Plaintiff

22   claims that he was forced to accept his meals with his soiled hands because he was denied a meal

23   tray or eating utensils. (Pl.'s Compl. at ¶ 107; Pl.'s Decl. at ¶ 71.)

1    On April 16, 2017, a CCJ nurse observed Plaintiff and raised the unsanitary conditions to

2    Defendant Plotner. (Pl.'s Compl. at ¶ 111; Pl.'s Decl. at ¶¶ 72-73, Ex. K at 54-55, Ex. L at 57.)

3    Plaintiff claims Defendant Plotner did not take any action at that time. (Pl.'s Compl. at ¶ 111.)

4    Plaintiff asserts that he subsequently requested mental health treatment and cleaning supplies

5    from Defendant Dougher but was also denied. (*Id.* at ¶ 112.)

6        In September 2017, a CCJ psychologist prescribed Plaintiff coloring materials, mazes,

7    puzzles, cross words, and word search puzzles. (Pl.'s Compl. at ¶ 114; Pl.'s Decl. at ¶ 79.) The

8    CCJ initially denied Plaintiff access to these materials until Defendant Gentry issued a memo

9    making these items a part of Plaintiff's Step Program. (Pl.'s Compl. at ¶ 115.)

10                5.    Nutraloaf

11        As previously noted, during his time at the CCJ, Plaintiff was placed on a nutraloaf diet.

12    (Pl.'s Compl. at ¶¶ 107, 116-123; Pl.'s Decl. at ¶¶ 75-76; Bishop Decl. at ¶ 22; Gentry Decl. at

13    ¶ 9.) Plaintiff states the portions of nutraloaf he was provided were so small that he suffered

14    constant hunger pains and that the prolonged use of the diet caused him to develop GI tract

15    problems. (Pl.'s Compl. at ¶¶ 118-20; Pl.'s Decl. at ¶ 76.) Plaintiff claims it caused him

16    constipation and to suffer from abdominal pain and bloody stool for months. (*Id.*) Plaintiff

17    alleges he had to seek medical attention as a result of the nutraloaf diet. (Pl.'s Compl. at

18    ¶ 121-122; Pl.'s Decl. at ¶ 77.) Plaintiff alleges that Defendant Gentry knew the nutraloaf was

19    causing him to develop medical issues but continued to use it punitively. (Pl.'s Compl. at ¶ 123.)

20    Relevant to this claim, Plaintiff further alleges he was denied a meal tray or eating utensils and

21    was forced to eat the nutraloaf with his soiled hands after he had smeared feces in his cell. (Pl.'s

22    Compl. at ¶ 107; Pl.'s Decl. at ¶ 71.)

23

1    Defendants state that nutraloaf was given to Plaintiff in an attempt to gain his compliance

2   with CCJ rules and to stop making biohazards in his cell. (Bishop Decl. at ¶ 22; Gentry Decl. at

3   ¶ 9.) Defendants state that nutraloaf was provided for a limited period of time, and that Plaintiff

4   was eventually provided normal food trays after he stopped creating biohazards on a near

5   constant basis. (*Id.*)

6              6.    <u>Shackling and Restraints</u>

7    Based on his Security Plan, when Plaintiff was moved throughout the CCJ, he

8   regularly moved with restraints on his wrists and ankles. (Pl.'s Compl. at ¶ 85; Pl.'s Decl. at ¶

9   58; Tangen Decl. at ¶ 14.) Plaintiff notes that Defendants Gentry, Austin, Ashworth, Schaub,

10  Plotner, Anderson and Wolfe either carried out or supervised his shackling. (Pl.'s Compl. at ¶ 92;

11  Pl.'s Decl. at ¶ 59.) Plaintiff alleges he was not allowed any socks or pants while wearing the

12  shackles and that they were often applied to his bare skin, which caused him cuts along his

13  ankles and legs. (Pl.'s Compl. at ¶¶ 86-90, Ex. E at 26; Pl.'s Decl. at ¶¶ 58, 60.)

14    Plaintiff states he would ask a nurse to bandage his wounds but claims Defendants would

15  often remove the bandages before returning him to his cell. (Pl.'s Compl. at ¶ 93; Pl's Decl. at

16  ¶ 61.) Plaintiff alleges Defendants Gentry and Austin would also taunt him if he complained of

17  the pain caused by the shackles and that the shackles caused discolored and raised scars on his

18  legs and ankles that did not fully heal until after he left the CCJ. (Pl.'s Compl. at ¶¶ 94, 96; Pl.'s

19  Decl. at ¶¶ 62, 66, Ex. F at 33-41.) Plaintiff notes that he was not allowed to grieve this issue

20  until his defense attorney got involved and an investigator came to the CCJ to document his

21  injuries. (Pl.'s Decl. at ¶ 65; Pl.'s Decl., Ex. F at 33-41.)

22    Defendants dispute that Plaintiff was not allowed to wear socks while being transported.

23  (Tangen Decl. at ¶ 16.) Defendants note Plaintiff was evaluated by CCJ medical staff after

1  notifying them that he had injuries to his ankles from being shackled and was advised by CCJ

2  medical staff to wear socks whenever he was transported. (*Id.*) Socks were subsequently

3  authorized for later transports. (Bishop Decl., Ex. E (Dkt. # 45-5) at 2-4.)

4                      ii.    *CCJ Grievance Policy and Grievance History*

5          Inmates at the CCJ are provided with an inmate handbook after their intake process is

6  complete and they have been given a cell housing assignment. (Bishop Decl. at ¶ 27, Ex. C (Dkt.

7  # 45-3).) The inmate handbook informs inmates of the CCJ's disciplinary system and grievance

8  procedure. (Bishop Decl. at ¶ 27, Ex. C at 18, 32, 38-45; Pl.'s Decl. at ¶ 26.) The CCJ grievance

9  policy outlines that inmates must first attempt to resolve all grievable issues informally through

10 oral communication with a CCJ employee, but if the issue cannot be resolved informally, a

11 "grievance/appeal form" may be submitted. (Bishop Decl., Ex. C at 18.) The policy notes that all

12 guidelines, steps, and timelines must be followed to exhaust administrative remedies. (*Id.*)

13          Per CCJ's grievance policy, CCJ inmates have up to seven days from the time of the

14 event to submit a "grievance/appeal form." (Bishop Decl., Ex. C at 18.) If the inmate is

15 dissatisfied with the response to their grievance, the inmate then has 48 hours from receiving the

16 CCJ employee's response to file a grievance to the next level. (*Id.*) In addition, the policy notes

17 that medical grievances must be submitted on a "medical inmate grievance form." (*Id.*)

18          Plaintiff submits that pursuant to the Step Program, he was not allowed to file electronic

19 grievances and that he was instead required to use a paper grievance system that he could only

20 file during his one hour out. (Pl.'s Decl. at ¶¶ 80-83; *see* Pl.'s Compl., Ex. H at 39-58.) Plaintiff

21 alleges that because he was not allowed to use the electronic system, many of his paper

22 grievances that he filed never received a response or otherwise disappeared. (Pl.'s Decl. at ¶ 86.)

23 Plaintiff additionally notes that, per the paper grievance itself, all of Defendants responses were

1   supposed to be placed on the back of the original grievance form. (*Id.* at ¶¶ 89-90.) However,

2   Plaintiff notes that Defendant Bishop routinely failed to answer his grievances in this manner,

3   and instead, would combine responses into a single document. (*Id.*; Pl.'s Compl., Ex. H at 34-38;

4   Bishop Decl., Ex. E.)

5          While housed at the CCJ, Plaintiff submitted several grievances based on the alleged

6   claims detailed in his complaint and the circumstances of his confinement. (Pl.'s Compl., Ex. H

7   at 39-58; Pl.'s Decl., Ex. M at 59, Ex. N at 61-62, Ex. R at 83-84, Ex. S at 86-87; Ex. T at 90;

8   Bishop Decl. at ¶ 27, Ex. E, Ex. F (Dkt. # 45-6), Ex. G (Dkt. # 45-7), Ex. H (Dkt. # 45-8), Ex. I

9   (Dkt. # 45-9), Ex. K (Dkt. # 45-11).) Pertinent to the instant matter, Plaintiff did not submit any

10  grievances regarding his limitations on visitors. (Bishop Decl. at ¶ 28, Ex. G at 2-3; *see* Pl.'s

11  Compl., Ex. H at 39-58, Pl's Decl.) Plaintiff did submit a regular grievance regarding the

12  nutrition and quantity of the nutraloaf provided and a medical grievance regarding the effect it

13  was having on his physical health. (Bishop Decl. at ¶ 29, Ex. G at 2-3, Ex. H at 2-3.) Defendants'

14  record of Plaintiff's nutraloaf grievances suggests Plaintiff did not fully exhaust the appeal

15  process on either grievance. (*Id.*) However, Plaintiff's submissions appear to reflect that his

16  medical grievance regarding the nutraloaf was fully exhausted to CCJ Chief Bishop.[1] (*See* Pl.'s

17  Decl., Ex. S at 86-86.)

18         Plaintiff grieved the unsanitary conditions in his cell once. (Bishop Decl. at ¶ 30, Ex. F at

19  2-3.) Per that grievance, Plaintiff claimed there were feces in his cell window screen. (Bishop

20  Decl., Ex. F at 2-3.) CCJ staff responded that Plaintiff had previously created that biohazard,

21

22  _____

[1] The Court notes Defendants' submission of Plaintiff's medical grievance regarding the nutraloaf appears
incomplete. Both parties submitted the same medical grievance as part of the record with their respective
filings, however Plaintiff's submission contains additional information demonstrating he submitted a jail
administrator level appeal of this grievance on June 23, 2017. (*See* Pl.'s Decl., Ex. S at 86-87.) This
information is omitted from Defendants' submission of the same grievance. (*Compare* Bishop Decl. at
¶ 29, Ex. H at 2-3 *with* Pl.'s Decl., Ex. S at 86-87.)

REPORT AND RECOMMENDATION - 14

1   which required professional cleaning, and that no other inmates had created any other biohazards

2   in the cell. (*Id.*) The grievance was denied at the first level, and Plaintiff did not appeal. (*Id.*)

3   Based on Plaintiff's submissions with his declaration, however, Plaintiff did submit an additional

4   grievance relating to his claims of unsanitary conditions in his cell that mentioned that he was

5   forced to eat his nutraloaf without utensils and with feces-covered hands. (*See* Pl.'s Decl., Ex. T

6   at 90.) It is unclear from Plaintiff's submission whether this grievance was responded to by

7   Defendants or if this grievance was fully exhausted.

8        Plaintiff submitted one grievance concerning his access to mental health treatment.

9   (Bishop Decl. at ¶ 31, Ex. I at 2-3.) Plaintiff's grievance claimed he was being denied access to

10  coloring materials and puzzles that had been prescribed to him to assist with his mental health

11  issues. (Bishop Decl., Ex. I at 2.) CCJ medical staff responded that the coloring materials and

12  puzzles were cleared with classification and provided. (*Id.*) Plaintiff did not grieve the issue any

13  further. (*See id.* at 3.)

14       **C.    Plaintiff's Claims**

15       Pursuant to Judge Fricke's Report and Recommendation, Plaintiff's: (1) Fourth

16  Amendment claims against Defendants Tangen, Barnett, and Bishop, in their individual

17  capacities; (2) Eighth Amendment claims in total; and (3) strip search and leg shackle claims

18  against Defendants Tangen, Barnett, and Bishop, in their individual capacity, were all dismissed

19  with prejudice. (*See* R. & R. at 37-39.) Plaintiff was also granted leave to amend several of his

20  claims. (*See id.*) To date, Plaintiff has not amended his complaint with respect to those claims.

21  As a result, Plaintiff's: (1) First Amendment claims; (2) Fourth Amendment claims against

22  Defendants Tangen, Barnett, and Bishop, in their official capacities; (3) visitation rights claims

23  against all Defendants, save for Defendant Gentry in his official capacity; (4) exercise and

1    recreation claims against all Defendants, save for Defendant Gentry in his individual and official

2    capacity; (5) claims related to oral hygiene and shaving materials; (6) sanitary conditions claims

3    against all Defendants, save for Defendants Gentry, Plotner, and Dougher in their individual

4    capacities; (7) claims related to access to bedding and clothing; (8) mental health treatment

5    claims against all Defendants, save for Defendants Gentry, Plotner, and Dougher in their

6    individual capacities; (9) nutraloaf claims against all Defendants, save for Defendant Gentry in

7    his individual capacity; (10) strip search and leg shackle claims against Defendants Tangen,

8    Barnett, and Bishop, in their official capacity; (11) Fourteenth Amendment Equal Protection

9    Clause claims; (12) Washington state law tort claims; and (13) claims for injunctive relief that

10   were all previously dismissed without prejudice and with leave to amend, should all now be

11   dismissed with prejudice.

12           However, Judge Fricke found Plaintiff could proceed on his: (1) Fourth Amendment

13   claims against Defendants Gentry, Austin, Ashworth, Anderson, Plotner, Schaub and Wolfe, in

14   their individual and official capacities; (2) visitation rights claims against Defendant Gentry, in

15   his official capacity; (3) exercise and recreation claims against Defendant Gentry, in his

16   individual and official capacity; (4) sanitary conditions claims against Defendants Gentry,

17   Plotner and Dougher, in their individual capacities; (5) mental health treatment claims against

18   Defendants Gentry, Plotner and Dougher, in their individual capacities; (6) Nutraloaf claims

19   against Defendant Gentry, in his individual capacity; and (7) strip search and leg shackle claims

20   against Defendants Gentry, Austin, Ashworth, Anderson, Plotner, Schaub and Wolfe, in their

21   individual and official capacities. (*Id.*) Plaintiff requests: (1) declaratory judgment against

22   Defendants for all of his claims; (2) an injunction on the use of the Step Program, strip searches,

23

1    and use of leg shackles if he is returned to the CCJ; and (3) compensatory and punitive damages.

2    (Pl.'s Compl. at 23-26.)

3                              **III.    DISCUSSION**

4          Defendants seek summary judgment with respect to Plaintiff's remaining claims on the

5    basis that: (1) a portion of Plaintiff's remaining claims are barred due to a failure to exhaust his

6    administrative remedies; (2) Plaintiff's Step Program and Security Plan were implemented by

7    Defendants pursuant to legitimate penological interests of protecting the safety and security of

8    the CCJ; and (3) Plaintiff otherwise fails to state a claim. (Defs.' Mot at 19-38.) The Court

9    considers each of those claims below:

10         **A.    Legal Standards**

11              *i.        Summary Judgment*

12         Summary judgment is appropriate when the "movant shows that there is no genuine

13   dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

14   Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The moving party is

15   entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient

16   showing on an essential element of his case with respect to which he has the burden of proof.

17   *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party bears the initial burden

18   of showing the Court "that there is an absence of evidence to support the nonmoving party's

19   case." *Id.* at 325. The moving party can carry its initial burden by producing affirmative evidence

20   that negates an essential element of the nonmovant's case or by establishing that the nonmovant

21   lacks the quantum of evidence needed to satisfy its burden at trial. *Nissan Fire & Marine Ins.*

22   *Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). The burden then shifts to the

23   nonmoving party to establish a genuine issue of material fact. *Matsushita Elec. Indus. Co. v.*

1   *Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court must draw all reasonable inferences in

2   favor of the nonmoving party. *Id.* at 585-87.

3          Genuine disputes are those for which the evidence is such that a "reasonable jury could

4   return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 257. The opposing party must

5   present significant and probative evidence to support its claim or defense. *Intel Corp. v. Hartford*

6   *Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991). "The mere existence of a scintilla

7   of evidence in support of the non-moving party's position is not sufficient[]" to defeat summary

8   judgment. *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). In addition,

9   it is the nonmoving party's responsibility to "identify with reasonable particularity the evidence

10  that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (quoted

11  source omitted). The Court need not "scour the record in search of a genuine issue of triable

12  fact." *Id.* (quoted source omitted); *see also* Fed. R. Civ. P. 56(c)(3) ("The court need consider

13  only the cited materials, but it may consider other materials in the record.").

14         A verified complaint, such as Plaintiff's, "may be treated as an affidavit to oppose

15  summary judgment to the extent it is based on personal knowledge and sets forth specific facts

16  admissible in evidence." *Keenan v. Hall*, 83 F.3d 1083, 1090 n.1 (9th Cir. 1996) (internal

17  quotations omitted); *see also Jones v. Blanas*, 393 F.3d 918, 922-23 (9th Cir. 2004). But

18  allegations that are based merely on Plaintiff's belief are insufficient to oppose summary

19  judgment, as are unsupported conjecture and conclusory statements. *See Hernandez v. Spacelabs*

20  *Med. Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003); *McElyea v. Babbitt*, 833 F.2d 196, 197-98 n.1

21  (9th Cir. 1987) (per curiam).

22

23

1

        *ii.*       *Section 1983 Claims*

2

      To state a claim for relief under 42 U.S.C. § 1983, a plaintiff must show: (1) he suffered a

3

violation of his rights protected by the Constitution or created by federal statute; and (2) the

4

violation was proximately caused by a person acting under color of state law. *West v. Atkins*,

5

487 U.S. 42, 48 (1988); *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). To satisfy the

6

second prong, a plaintiff must allege facts showing how individually named defendants caused or

7

personally participated in the harm alleged in the complaint. *Arnold v. IBM*, 637 F.2d 1350, 1355

8

(9th Cir. 1981). The causation requirement of § 1983 is satisfied only if a plaintiff demonstrates a

9

defendant did an affirmative act, participated in another's affirmative act, or omitted to perform

10

an act he was legally required to do that caused the deprivation complained of. *Id.* (citing

11

*Johnson v. Duffy*, 588 F.2d 740, 743-44 (9th Cir. 1978)).

12

    **B.**     **Exhaustion of Administrative Remedies**

13

        *i.*       *Exhaustion Legal Standard*

14

      The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought

15

with respect to prison conditions under section 1983 of this title, or any other Federal law, by a

16

prisoner confined in any jail, prison, or other correctional facility until such administrative

17

remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Under the PLRA, a prisoner

18

must exhaust "available" administrative remedies before filing suit. *Woodford v. Ngo*, 548 U.S.

19

81, 85 (2006), *accord*, *Jones v. Bock*, 549 U.S. 199, 211 (2007) ("There is no question that

20

exhaustion is mandatory under the PLRA"); *Albino v. Baca*, 747 F.3d 1162, 1165 (9th Cir. 2014)

21

(en banc). The prisoner must complete the administrative review process in accordance with the

22

applicable rules. *Woodford*, 548 U.S. at 92-95 (requiring "proper" exhaustion, meaning full

23

compliance by a prisoner with all procedural requirements of an institution's grievance process).

1      Defendant bears the initial burden of showing there was an available administrative

2   remedy and that plaintiff did not exhaust that remedy. *Albino*, 747 F.3d at 1169, 1172. Once that

3   showing is made, the burden shifts to plaintiff, who must either demonstrate he, in fact,

4   exhausted administrative remedies or "come forward with evidence showing that there is

5   something in his particular case that made the existing and generally available administrative

6   remedies effectively unavailable to him." *Id.* at 1172. The Supreme Court has previously

7   explained administrative remedies are deemed "unavailable" to an inmate: (1) where the

8   administrative remedy "operates as a simple dead end—with officers unable or consistently

9   unwilling to provide any relief to aggrieved inmates"; (2) where the administrative scheme is

10  opaque and incapable of use; and (3) where administrators "thwart inmates from taking

11  advantage of a grievance process through machination, misrepresentation, or intimidation." *Ross*

12  *v. Blake*, 136 S.Ct. 1850, 1859-60 (2016); *Fuqua v. Ryan*, 890 F.3d 838, 850 (9th Cir. 2018).

13  Because failure to exhaust is an affirmative defense defendant must plead and prove, the ultimate

14  burden rests with defendant. *Albino*, 747 F.3d at 1172.

15      Summary judgment is appropriate if the undisputed evidence, viewed in the light most

16  favorable to plaintiff, shows a failure to exhaust. *Albino*, 747 F.3d at 1166, 1168; Fed. R. Civ. P.

17  56(a). If administrative remedies have not been exhausted at the time an action is brought, the

18  action must be dismissed without prejudice. *McKinney v. Carey*, 311 F.3d 1198, 1199 (9th Cir.

19  2002) (per curiam); *see also Wyatt v. Terhune*, 315 F.3d 1108, 1120 (9th Cir. 2003), *overruled*

20  *on other grounds by Albino*, 747 F.3d at 1162 ("If the district court concludes that the prisoner

21  has not exhausted nonjudicial remedies, the proper remedy is dismissal of the claim without

22  prejudice.").

23      \\

REPORT AND RECOMMENDATION - 20

1

2          *ii.        Analysis*

3          Defendants' Motion argues Plaintiff failed to exhaust his administrative remedies prior to

4   bringing this action for issues surrounding the unsanitary conditions related to nutraloaf, his

5   limitation on visitors, his mental health treatment, and unsanitary conditions in his cell. (Defs.'

6   Mot. at 19-22.) Plaintiff argues he should not be required to fully exhaust his available

7   administrative remedies because several of his grievance responses were either missing or

8   unanswered by Defendants and because he was forced to use the paper grievance system for a

9   time. (Pl.'s Resp. at 12-14. 31-33.) Plaintiff notes that he was not given the opportunity to use an

10  electronic kiosk to file his grievances, but was instead given access to paper grievances, and he

11  claims CCJ Chief Bishop did not respond to any of his grievances submitted on the written

12  forms.[2] (*Id.*; *see also* Pl.'s Decl. at ¶¶ 88-95, Ex. M at 59, Ex. N. at 61.) As such, Plaintiff argues

13  that he has exhausted his available administrative remedies where possible and that any failure to

14  exhaust should be excused because Defendants abused the grievance system in order to cause the

15  process to go uncompleted. (*Id.*)

16         Here, Defendants submitted evidence that the CCJ provides an administrative grievance

17  process and Plaintiff failed to utilize it completely for his claims regarding his limitations on

18  visitors and mental health treatment. Despite being familiar with the CCJ's administrative

19  grievance procedures, the record demonstrates Plaintiff did not submit any grievances relating to

20  his limitation on visitors claim. (*See* Bishop Decl. at ¶¶ 28; Pl.'s Compl., Ex. H; Pl.'s Decl.)

21  Plaintiff contends that his grievances relating to the implementation of the Step Program itself,

22  and its overall conditions, functions as an exhausted grievance in regard to his visitation claim.

23  ---
[2] Defendant Bishop generally responded to Plaintiff's grievances in one document that referenced each grievance he was responding to despite the paper grievance indicating it would be responded to on the grievance form itself. (Pl.'s Compl., Ex. H at 34-38; Bishop Decl., Ex. E.)

1    (*See* Pl.'s Resp. at 21, Pl.'s Compl., Ex. H at 41-42, 51-52.) However, Plaintiff's cited grievances

2    grieved the implementation of the Step Program itself as a disciplinary system that he was

3    subject to and did not specifically grieve Plaintiff's denial of visitation condition. (*See id.*)

4    Moreover, Plaintiff fails to demonstrate or allege a visitation he requested that was improperly

5    denied or that a grievance is missing or unanswered in the record related to such a claim. (*See*

6    Pl.'s Resp. at 21.)

7        The record demonstrates Plaintiff made one attempt to grieve his access to mental health

8    care treatment. (Bishop Decl. at ¶ 31, Ex. I at 2-3.) After CCJ medical staff responded that the

9    requested coloring materials and puzzles were cleared and provided to him, Plaintiff did not

10   grieve the issue any further. (*See id.*) Plaintiff does not dispute that he did not exhaust

11   Defendants' cited grievance, but counters that he filed two separate grievances regarding his lack

12   of mental health treatment that went unanswered by CCJ staff at level two. (Pl.'s Resp. at 27-28.)

13   Plaintiff also contends his grievances relating to the implementation of the Step Program serve as

14   an exhausted grievance for this claim because his mental health treatment items were restricted

15   to Plaintiff reaching level three of the Step Program. (*Id.*; Pl.'s Compl., Ex. H at 41-42, 51-52.)

16   Plaintiff does not cite to, or otherwise submit, any specific grievances he claims went

17   unanswered by Defendants pertaining to his mental health treatment claim. Furthermore, as

18   previously noted, Plaintiff's Step Program grievances specifically grieved the Step Program

19   implementation as a disciplinary program and not the condition of not receiving his mental

20   health treatment items. (*See* Pl.'s Compl., Ex. H at 41-42, 51-52.)

21        Consequently, based on the record before the Court as to Plaintiff's claims regarding his

22   lack of visitation and mental health treatment, Plaintiff fails to demonstrate he in fact exhausted

23   his administrative remedies at the CCJ or that an impediment existed making the CCJ's available

1   administrative remedies effectively unavailable to him for these claims. *See Woodford*, 548 U.S.

2   at 92-95. Therefore, Plaintiff's claims regarding his access to mental health care treatment and

3   lack of visitors should both be dismissed without prejudice. *See McKinney*, 311 F.3d at 1199;

4   *Wyatt*, 315 F.3d at 1120.

5          As to Plaintiff's claims regarding the nutraloaf and the sanitary conditions of his cell, it is

6   not clear to the Court on this record that Plaintiff failed to fully exhaust his available

7   administrative remedies. Plaintiff submitted two grievances regarding the nutraloaf itself: (1) a

8   standard grievance regarding the nutrition and quantity of the nutraloaf provided; and (2) a

9   medical grievance regarding the effect it was having on his physical health. (Bishop Decl., Ex. G

10  at 2-3, Ex. H at 2-3.) Plaintiff grieved the unsanitary conditions in his cell once. (Bishop Decl.,

11  Ex. F at 2-3.) Per that grievance, Plaintiff claimed there were feces in his cell window screen, but

12  it was denied at the first level because he had previously created a biohazard in that same cell,

13  and Plaintiff did not appeal that decision any further. (*Id.*)

14         Despite Defendants' contention that Plaintiff failed to fully exhaust a grievance

15  pertaining to the nutraloaf issue or the sanitary conditions of his cell, Plaintiff has submitted

16  evidence with his declaration that demonstrates he did fully exhaust a medical grievance

17  regarding his nutraloaf claim. (*Compare* Bishop Decl. at ¶ 29, Ex. H at 2-3 *with* Pl.'s Decl., Ex.

18  S at 86-87.) In addition, Plaintiff has submitted evidence of a grievance omitted from

19  Defendants' exhibits regarding the sanitary conditions of his cell and the manner in which he

20  was subjected to eating nutraloaf with feces-covered hands. (*See* Pl.'s Decl., Ex. T at 90.) In that

21  grievance, Plaintiff notes that he was kept in his cell for seven days covered in feces and that

22  none of the CCJ staff would give him cleaning supplies or soap to wash with. (*Id.*) Plaintiff notes

23  that CCJ staff forced him to accept his nutraloaf with feces-covered hands as he was not allowed

1    access to a plate or a spoon. (*Id.*) The grievance indicates it was submitted to "C/O Bond" on

2    April 18, 2017, but there is no additional documentation regarding a response from Defendants

3    or whether this grievance was further appealed. (*Id.*) Defendants have failed to counter or

4    otherwise address this submitted grievance in their reply. (*See* Defs.' Reply.)

5         Accordingly, the Court declines to find that Defendants have demonstrated Plaintiff

6    failed to fully exhaust his available administrative remedies as to his claims related to the

7    nutraloaf and the sanitary conditions of his cell.

8    **C.     Plaintiff's Remaining Claims**

9         Defendants argue that Plaintiff's remaining claims should be dismissed because the Step

10   Program and Security Plan were created and implemented pursuant to legitimate penological

11   interests of protecting the safety and security of the CCJ. (Defs.' Mot at 22-27.) The

12   impingement of an inmate's constitutional rights is valid if the regulation is reasonably related to

13   legitimate penological interests. *Turner v. Safley*, 482 U.S. 78, 89 (1987); *see also Washington v.*

14   *Harper*, 494 U.S. 210, 224 (1990) (finding *Turner* applies whenever "the needs of prison

15   administration implicate constitutional rights"); *Michenfelder v. Sumner*, 860 F.2d 328, 331 (9th

16   Cir. 1988) (applying *Turner* to prisoners' allegations of Fourth Amendment violations). To make

17   this determination, the Court balances the four factors set forth in *Turner*: (1) whether there is a

18   valid, rational connection between the prison regulation and the legitimate governmental interest

19   put forward to justify it; (2) whether alternative means of exercising the right on which the

20   regulation impinges remains open to prison inmates; (3) whether accommodation of the asserted

21   constitutional right will impact guards, other inmates, and the allocation of prison resources; and

22   (4) whether there is an absence of ready alternatives, versus the presence of obvious, easy

23   alternatives. *Turner*, 482 U.S. at 89-91. "The burden is on the prisoner challenging the

REPORT AND RECOMMENDATION - 24

1     regulation, not on the prison officials, to show that there are obvious, easy alternatives to the

2     regulation." *Mauro v. Arpaio*, 188 F.3d 1054, 1062 (9th Cir. 1999).

3            A reviewing court "must accord substantial deference to the professional judgment of

4     prison administrators, who bear a significant responsibility for defining the legitimate goals of a

5     corrections system and for determining the most appropriate means to accomplish them."

6     *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003); *see also Florence v. Bd. of Chosen Freeholders*

7     *of Cty. of Burlington*, 566 U.S. 318, 322-23 (2012) ("[C]ourts must defer to the judgment of

8     correction officials unless the record contains substantial evidence showing their policies are an

9     unnecessary or unjustified response to problems of jail security."). The burden is not on the state

10    to prove the validity of a challenged regulation but is instead on the inmate to disprove it.

11    *Overton*, 539 U.S. at 132.

12           With this authority in mind, the Court turns to Plaintiff's remaining claims:

13                i.       *Fourth Amendment Claim*

14           Plaintiff first alleges Defendants Gentry, Austin, Ashworth, Anderson, Plotner, Schaub

15    and Wolfe, in their individual and official capacities, violated his Fourth Amendment rights by

16    implementing the Step Program, which authorized routine strip searches. (Pl.'s Compl. at

17    ¶¶ 13-44, 132-136.)

18           On this claim, Defendants argue that they generally conducted the strip searches to

19    manage Plaintiff's security risk. (Defs.' Mot. at 22, 27.) Defendants note that after Plaintiff's

20    attempt to escape, or breach the CCJ's security, he was strip searched, and the search revealed a

21    metal ball bearing that fell out of his body after he was requested to squat. (*Id.* at 27.) As a result,

22    Defendants argue under the *Turner* test the searches were pursuant to legitimate penological

23    interests of protecting the safety and security of the CCJ because Plaintiff presented a significant

1   security threat and had demonstrated he was capable of hiding contraband on his body. (*Id.*)

2   Defendants argue, in the alternative, that Plaintiff fails to state a Fourth Amendment claim

3   because the searches were reasonable in light of the circumstances Plaintiff created while he was

4   housed at the CCJ. (*Id.* at 28-30.)

5       Plaintiff counters that Defendants Gentry, Austin, Ashworth, Anderson, Plotner, Schaub,

6   and Wolfe violated his Fourth Amendment rights because they subjected him to strip searches as

7   a punitive measure. (Pl.'s Resp. at 17-19.) Plaintiff argues that he was held in administrative

8   segregation with video monitoring and security checks every 15 minutes, that the majority of the

9   searches occurred late at night, and that the searches were conducted in a harassing manner by

10  touching the metal detecting wand to his genitals and rectum before scanning and touching his

11  face. (*Id.* at 17-18.) Plaintiff additionally argues that Defendants Gentry and Austin both told him

12  the strip searches were punitive. (*Id.* at 18.)

13      Here, the Court finds that the strip searches were rationally related to a legitimate

14  penological interest and that Plaintiff has otherwise failed to state claim. In considering the

15  *Turner* factors, under the first factor, Plaintiff's strip searches were authorized pursuant to

16  Plaintiff's Security Plan which was implemented as a direct result of Plaintiff's breach of

17  security protocol and possession of contraband while housed at the CCJ. (*See* Bishop Decl. at

18  ¶ 11.) As previously detailed, it is not contested by the parties that Plaintiff managed to break the

19  glass on his cell window. (Pl.'s Resp. at 15-16; Pl.'s Decl. at ¶¶ 10-15; Bishop Decl. at ¶ 7, Ex. A

20  at 2-12, Ex. B; Tangen Decl. at ¶ 7.) Furthermore, Plaintiff submitted in his declaration that he

21  attempted to hide the broken cell window from CCJ staff by placing a folder containing his legal

22  materials in the space because it looked the same as the surrounding area. (Pl.'s Decl. at ¶ 15.)

23

REPORT AND RECOMMENDATION - 26

1  Plaintiff also acknowledges that he was in possession of a "fishing line" and a tube of liquified

2  graphite. (*Id.* at ¶ 22.)

3          Defendants claim a ball bearing was also found on the floor of Plaintiff's holding cell

4  after he was requested to squat and that it was similar in size and appearance to those used in

5  towel holders at the CCJ. (Bishop Decl. at ¶ 9, Ex. A at 5-7, 16, 46; Tangen Decl. at ¶ 12.)

6  Plaintiff argues a genuine issue of material fact exists as to the ball bearing as he claims it was

7  just found on the floor. (Pl.'s Decl. at ¶¶ 17-20.) However, Plaintiff's account of the ball bearing

8  remains conclusory and is unsupported by the contemporary record of the search where Plaintiff

9  instead claimed that the ball bearing had come from a penal piercing he previously had and

10  stated there were two more under his skin. (*See* Bishop Decl. at ¶ 9, Ex. A at 5-7, 46.) Therefore,

11  Plaintiff's account of the ball bearing fails to create an issue of material fact pertinent to

12  determining this issue. *See Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1059 n.5, 1061

13  (9th Cir. 2002) ("This court has refused to find a "genuine issue" where the only evidence

14  presented is "uncorroborated and self-serving" testimony). Based on Plaintiff's breach of the

15  CCJ's security, Defendants have presented a valid, rational connection between the

16  implementation of the strip searches as part of his Security Plan and the legitimate interests of

17  the CCJ in managing the security of the CCJ. *See Bull v. City & Cty. of San*

18  *Francisco*, 595 F.3d 964, 972 (9th Cir. 2010) ("Because 'prison officials must be free to take

19  appropriate action to ensure the safety of inmates and corrections personnel,' even those

20  restrictions that infringe upon 'a specific constitutional guarantee' must be 'evaluated in the light

21  of the central objective of prison administration, safeguarding institutional security.'") (quoting

22  *Bell v. Wolfish*, 441 U.S. 520, 547 (1979)).

23

In considering the additional *Turner* factors, the second factor does not appear to apply to Plaintiff's Fourth Amendment claim as no alternative means exist for an inmate to exercise his right to be free from unreasonable searches. *See Michenfelder*, 860 F.2d at 331 n.1 ("Not all four factors will be relevant to each case . . . [T]he second *Turner* factor . . . is much more meaningful in the [F]irst [A]mendment context than the [F]ourth or [E]ighth . . . ."). Under the third factor, though Defendants fail to argue a specific impact on the allocation of prison resources, it is clear from the record that not being able to conduct strip searches of Plaintiff for contraband would raise the likelihood of threats to both CCJ staff and inmate safety because of his security risk. (*See* Bishop Decl. at ¶¶ 9-11, Tangen Decl. at ¶¶ 10-12.) Finally, Plaintiff identifies no other cost effective or less intrusive means of detecting contraband at the CCJ. *See Mauro*, 188 F.3d at 1062. In addition, the Court further notes that Defendants' determination that the searches were necessary is also afforded deference. *Overton*, 539 U.S. at 132; *Florence*, 566 U.S. at 322-23. As such, the Court finds that the strip searches were rationally related to a legitimate penological interest in light of the circumstances Defendants Gentry, Austin, Ashworth, Anderson, Plotner, Schaub, and Wolfe faced in managing Plaintiff's security threat.

Moreover, the routine use of strip searches of Plaintiff by Defendants Gentry, Austin, Ashworth, Anderson, Plotner, Schaub, and Wolfe was also reasonable under the Fourth Amendment. The Fourth Amendment guarantees people the right to be free from unreasonable searches. U.S. Const. amend. IV. Prisoners do not possess "the full range of freedoms of an unincarcerated individual." *Bell*, 441 U.S. at 546. But pretrial detainees do retain some Fourth Amendment rights after being confined. *Id.* at 558; *Michenfelder*, 860 F.2d at 332 (finding Fourth Amendment right against unreasonable search "extends to incarcerated prisoners;

1   however, the reasonableness of a particular search is determined by reference to the prison

2   context.").

3        When determining the reasonableness of a search, which requires a case-by-case

4   "balancing of the need for the particular search against the invasion of personal rights that the

5   search entails," courts consider the following factors: (1) "the scope of the particular intrusion,"

6   (2) "the manner in which it is conducted," (3) "the justification for initiating it," and (4) "the

7   place in which it is conducted." *Byrd v. Maricopa Cty. Sheriff's Dep't*, 629 F.3d 1135, 1141 (9th

8   Cir. 2011) (quoting *Bell*, 441 U.S. at 559); *see also Nunez v. Duncan*, 591 F.3d 1217, 1227 (9th

9   Cir. 2010). The Ninth Circuit has previously acknowledged that searches that are "unnecessary

10   and unduly humiliating" or "excessive, vindictive, or unrelated to any legitimate penological

11   interest," violate the Fourth Amendment. *Shorter v. Baca*, 895 F.3d 1176, 1189 (9th Cir. 2018)

12   (citing *Michenfelder*, 860 F.2d at 332-33).

13        Here, under the first factor of the *Bell* framework, the scope of the search was a strip

14   search of a pretrial detainee for contraband, which under the circumstances of this case was

15   reasonable in light of the fact that Plaintiff had demonstrated he was a threat to the security of the

16   CCJ by breaking his cell window, having been found with contraband in his cell, and having had

17   a ball bearing fall out of his body after he was requested to squat after he broke his cell window.

18   *See Florence*, 566 U.S. at 334 (2012) (finding no Fourth Amendment violation occurred where

19   pretrial detainee was required to pass through metal detector and "lift his genitals, turn around,

20   and cough in a squatting position" prior to admission into the correctional facility). Under the

21   third factor, as previously considered above, the use of a strip search was justified in light of

22   Plaintiff's admitted breach of CCJ security protocols because controlling contraband within a

23   prison is a legitimate penological interest, *see Bell*, 441 U.S. at 550-51, and the CCJ's

1    implementation of strip searches though the Security Plan was reasonably related to this interest.

2    In considering the place and location under the fourth factor, Plaintiff acknowledges that the

3    searches were conducted in a private "dressing room." (*See* Pl.'s Decl. at ¶ 36.) Consequently,

4    the Court finds that consideration of these three factors all weighs in favor of Defendants in

5    finding the strip searches reasonable.

6         As to the second factor—the manner in which the searches were conducted—per

7    Plaintiff's account, CCJ officers would enter his cell, handcuff his hands behind his back, and

8    order him to kneel at the center of the cell. (Pl.'s Decl. at ¶¶ 34-35.) CCJ officers would grab his

9    arms and hold him in a chokehold while his legs were then shackled. (*Id.*) CCJ officers would

10   then force Plaintiff to walk to a dressing room where he was stripped while handcuffed and

11   shackled, and a CCJ officer would then use a metal detecting wand to scan Plaintiff's genitals

12   and rectum before scanning his face, with the wand sometimes coming into contact with his face.

13   (*Id.* at ¶¶ 36-37.) CCJ officers would then make Plaintiff squat over a mirror and cough several

14   times. (*Id.* at ¶ 38.)

15        Plaintiff additionally notes that half of these strip searches occurred late at night, often

16   right after he had fallen asleep. (Pl.'s Decl. at ¶ 39.) Specifically, Plaintiff asserts that he often

17   awoke to CCJ officers rushing into his unit "like a SWAT team," banging on his cell door and

18   windows, shining flashlights into his eyes, and screaming commands. (*Id.* at ¶¶ 40-41.) Plaintiff

19   further notes that during these night-time strip searches, a CCJ officer would produce a taser,

20   activate its laser sight, and point it in his direction. (*Id.* at ¶ 41.) Plaintiff claims that the strip

21   searches were the most "humiliating, frightening, and psychologically disturbing event of [his]

22   life" and that they caused him sleep deprivation and mental anguish. (*Id.* at ¶ 43.)

23

1    Defendants do not appear to dispute Plaintiff's general account of the manner in which

2    the strip searches were conducted. (*See* Bishop Decl. at ¶¶ 9-11; Tangen Decl. at ¶¶ 10-12; Defs.'

3    Mot. at 16-17, 27.) While the Court is troubled by Defendants need to wake Plaintiff late at night

4    to conduct the strip searches in the manner alleged given his constant surveillance, Defendants

5    note the strip searches had to be done frequently and at random so that Plaintiff could not

6    anticipate them based on his history of possessing contraband and the security concern he

7    presented. (*Id.*) The frequency of Plaintiff's strip searches was also later reduced to one or less

8    per day. (*See* Tangen Decl. at ¶ 10; Pl.'s Compl., Ex. H at 38.) Therefore, the Court finds that

9    this factor weighs slightly in favor of Defendants based on Plaintiff's noted security concerns.

10    In conclusion, in considering the relevant factors under both *Turner* and the *Bell*

11    framework, the Court finds that the strip searches were reasonable and not unnecessary or unduly

12    humiliating nor unrelated to any legitimate penological interest. Plaintiff's Fourth Amendment

13    claims against Defendants Gentry, Austin, Ashworth, Anderson, Plotner, Schaub and Wolfe

14    should be dismissed.

15          ii.      *Fourteenth Amendment Due Process Claims*

16    As a pretrial detainee, Plaintiff has the right to be free from punishment under the

17    Fourteenth Amendment. *Bell*, 441 U.S. at 533. A pretrial detainee's right to proper conditions of

18    confinement arises under the Due Process Clause of the Fourteenth Amendment and is evaluated

19    under an objective deliberate indifference standard. *See Gordon v. Cty. of Orange*, 888 F.3d

20    1118, 1124-25 (9th Cir. 2018) (applying objective standard to medical care claims and

21    describing similar treatment afforded to medical care and other conditions of confinement

22    claims) (citing *Kingsley v. Hendrickson*, 576 U.S. 389, 400-01 (2015), and *Castro v. Cty. of Los*

23    *Angeles*, 833 F.3d 1060, 1070 (9th Cir. 2016)). In assessing conditions of confinement for

pretrial detainees, the Court considers whether the conditions amount to punishment, causing

harm or disability significantly exceeding or independent of the inherent discomforts of

confinement, or whether the conditions merely result from some legitimate governmental

purpose. *See Doe v. Kelly*, 878 F.3d 710, 714, 720 (9th Cir. 2017); *Demery v. Arpaio*, 378 F.3d

1020, 1028 (9th Cir. 2004).

A pretrial detainee must demonstrate a defendant's acts or omissions were objectively

unreasonable, and identify objective facts indicating the challenged governmental action is not

rationally related to a legitimate governmental objective or that it is excessive in relation to that

objective. *Kingsley*, 576 U.S. at 397-98. If the conditions of confinement that are being

challenged are arbitrary or purposeless, "a court permissibly may infer that the purpose of the

governmental action is punishment." *Bell*, 441 U.S. at 539.

### 1.    Exercise and Recreation

Plaintiff alleges that Defendant Gentry violated his constitutional rights by restricting his

ability to spend time out of his cell because he was only allowed to spend time outside his cell

for one hour every three days at step one of his Step Program, with no access to exercise or

recreation equipment. (Pl.'s Compl. at ¶¶ 50-52.) Plaintiff further alleges that his outdoor

recreation time was severely limited. (*Id.* at ¶¶ 52-53.)

The Ninth Circuit Court of Appeals has previously held that "the Constitution requires

jail officials to provide outdoor recreation opportunities, or otherwise meaningful recreation to

prison inmates." *Shorter*, 895 F.3d at 1185-86; *see also Pierce v. Cty. of Orange*, 526 F.3d 1190,

1208 (9th Cir. 2008). "Although we have acknowledged that logistical problems, such as

inadequate staffing and limited recreational facilities, may make it difficult for jail officials to

provide adequate exercise to detainees, we have never condoned the wholesale, routine

deprivation of . . . meaningful recreation activities." *Shorter*, 895 F.3d at 1186 (internal

quotations and citations omitted). The Ninth Circuit has not articulated a specific minimum

amount of weekly recreation that must be afforded to detainees who spend the bulk of their time

inside their cells, however, the Ninth Circuit has noted inmates who are housed in administrative

segregation are constitutionally entitled to at least two hours of exercise unless security needs

make meeting that goal impossible. *Shorter*, 895 F.3d at 1185-1186 (citing *Pierce*, 586 F.3d at

1208, 1212 ("We agree that the County has considerable discretion to curtail access to exercise

based on security concerns.")).

As to this claim, Defendants argue Plaintiff was provided time out of his cell, as his

behavior allowed for in his Step Program. (Defs.' Mot. at 25.) Defendants note that though

Plaintiff was initially limited to an hour out every three days, this was changed over time to

allow him at least an hour out every day. (*Id.*) Defendants also note that the CCJ does not have

true outdoor yard options, but that it does have open-air rooms available for an inmate to recreate

in if they are at the allowed security level. (*Id.* at 25, 32.) Defendants assert, however, that

Plaintiff's time in the open-air cell was limited because he would attempt to communicate with

other inmates or pass contraband, which caused a threat to the safety and security of the CCJ. (*Id.*

at 32.) Defendants maintain that when Plaintiff followed his Step Program rules and did not

create a significant threat to the safety and security of the facility, he was allowed time out of his

cell. (*Id.*)

Plaintiff argues that though he was permitted one hour out of his cell every three days,

during his one hour out of his cell he was confined to a small room, was not allowed outside of

the room, and was not provided access to exercise or recreation equipment. (Pl.'s Resp. at 22.)

Plaintiff argues that during the 17 months he was housed at CCJ, he was only allowed to use the

1    outdoor recreation area four times. (*Id.* at 23.) Plaintiff further argues that Defendant Gentry's

2    Step Program implemented these conditions as a form of punishment and as retribution for

3    embarrassing CCJ. (*Id.* at 24-25.) In sum, Plaintiff argues that genuine issues of material fact

4    exist on this claim as to why he was denied access to recreation and had restricted out of cell

5    time, and whether the recreation area was equipped. (*Id.*)

6           Here, the Court finds that Plaintiff's limited time out of his was cell was rationally related

7    to maintaining security needs at the CCJ. Based on the record in this case, and as previously

8    considered above in relation to Plaintiff's Fourth Amendment claims, any restrictions on

9    Plaintiff's time out of his cell was in direct response to his behaviors while housed at the CCJ

10   and his overall security risk as contemplated by the Step Program and his Security Plan after

11   Plaintiff's breach of CCJ security protocol. In any event, the Court does not find that a genuine

12   issue of material fact exists as to this claim because it is not disputed that Plaintiff was provided

13   sufficient time outside of his cell despite his restrictions. *See Shorter*, 895 F.3d at 1185-1186;

14   *Pierce*, 586 F.3d at 1208, 1212. Even at level one of his Step Program, Plaintiff was permitted at

15   least two hours out of his cell every week, and as his behavior improved, Plaintiff was provided

16   additional time out of his cell. (*See* Bishop Decl., Exs. J, K.) Because Plaintiff was housed in the

17   administrative segregation unit, he was allowed time out of his cell to use the dayroom, which

18   was the common area that joined all of the cells on the assigned pod. (Gentry Decl. at ¶ 15.)

19   Plaintiff's use of the open-air recreation room was limited based on his security status and

20   behavior – as previously noted, Plaintiff received approximately thirty infractions while housed

21   at the CCJ. (*See* Bishop Decl. at ¶¶ 17, 21.) Consequently, Plaintiff did not routinely work his

22   way through the Step Program to the point where he could use the open-air recreation room with

23   regularity. (*See* Gentry Decl. at ¶ 14; Bishop Decl. at ¶ 26, Exs. J, K.)

1    Therefore, the Court finds Plaintiff has not established any violation of his constitutional

2    rights arising out of restrictions on his out-of-cell time and his outdoor recreation time and, thus,

3    Plaintiff's claims against Defendant Gentry regarding his lack of exercise and recreation time

4    should be dismissed.

5                      2.    Unsanitary Conditions

6    Next, Plaintiff claims that Defendants Gentry, Plotner, and Dougher, confined him in a

7    feces-covered cell without access to personal hygiene or cleaning supplies. (Pl.'s Compl. at

8    ¶¶ 73-74, 106.) Plaintiff argues that he was forced to stay in unsanitary conditions as a form of

9    punishment. (*Id.* at ¶¶ 104, 106, 111-112.)

10    The Constitution "does not mandate comfortable prisons[.]" *Rhodes v. Chapman*, 452

11    U.S. 337, 349 (1981). Conditions of confinement "may be, and often are, restrictive and harsh[.]"

12    *Morgan v. Morgensen*, 465 F.3d 1041, 1045 (9th Cir. 2006) (quoting *Rhodes*, 452 U.S. at 347).

13    The Ninth Circuit has determined, however, that "[j]ail officials have a duty to ensure that

14    detainees are provided adequate shelter, food, clothing, sanitation, medical care and personal

15    safety." *Shorter*, 895 F.3d at 1185 (citing *Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir. 2000)).

16    Defendants argue that Plaintiff repeatedly created biohazards in his cell by smearing his

17    feces on the walls, ceiling, window screen, and/or on the cell camera covers. (Defs.' Mot. at 26,

18    32-33.) Defendants maintain that Plaintiff was routinely moved to a clean cell when he did create

19    biohazards in his cell and that a cleaning company was hired to clean his biohazards when

20    needed. (*Id.* at 33.) Though Plaintiff was not allowed to keep soap and other hygiene items in his

21    cell, Defendants note he was allowed to ask for such items so that he could wash himself. (*Id.*)

22    Defendants further argue that Plaintiff was fully in control of when he created unsanitary

23    conditions in his cell and whether his hands were clean. (*Id.*)

REPORT AND RECOMMENDATION - 35

1    Plaintiff argues that as punishment for his actions of covering his cell in feces, and

2    despite being aware of his mental health concerns, Defendant Gentry required him to remain in a

3    feces-covered cell without access to cleaning supplies or hygiene items from April 10-20, 2017.

4    (Pl.'s Resp. at 28-29.) Plaintiff alleges that five of those 10 days were spent in constant

5    confinement. (*Id.* at 30.) Plaintiff also alleges that during this time he requested materials to

6    clean himself and the cell, but Defendants Dougher and Plotner denied his requests. (*Id.* at 29.)

7    Here, the Court finds genuine issues of material fact exist as to whether Plaintiff was

8    provided sufficient access to sanitation after creating biohazards in his cell, and whether any

9    restrictions were reasonably related to a legitimate governmental purpose. Though Defendants

10    assert Plaintiff himself created the issue related to the sanitary conditions of his cell, Plaintiff has

11    alleged he was subject to significant mental distress that caused him to hallucinate and to smear

12    feces in his cell. (*See* Pl.'s Decl. at ¶¶ 69-74.) Plaintiff alleges that during this period of time, he

13    was denied access to any hygienic or cleaning supplies. (*Id.*) Evidence presented by Plaintiff

14    demonstrates that a CCJ nurse raised the issue of the sanitary conditions of Plaintiff's cell to

15    Defendant Plotner on April 16, 2017. (*Id.* at ¶¶ 72-73; Ex. K at 54-55, Ex. L at 57.) Per

16    Plaintiff's medical flow sheet, Defendant Plotner at that time stated Plaintiff was only allowed

17    hygienic supplies during his hour out and "that cannot happen until [Plaintiff] talks to [Sergeant]

18    Gentry and can come to some kind of agreement." (*Id.*, Ex. L at 57.) This necessarily conflicts

19    with Defendants' contention that Plaintiff had access to hygienic supplies whenever he requested

20    and that he himself was solely responsible for his uncleanliness. (*See* Gentry Decl. at ¶ 6; Bishop

21    Decl. at ¶ 14.) Therefore, it is not clear from the record what level of access Plaintiff had to

22    cleaning materials to clean himself or his cell after creating biohazards from April 10-20, 2017,

23

1  or what manner and means Plaintiff may have had to ingest his food without implements to clean

2  himself.

3          The Court thus concludes that Plaintiff's claims against Defendants Gentry, Dougher, and

4  Plotner in their individual capacities regarding unsanitary conditions should not be dismissed at

5  this juncture.

6                          3.    Nutraloaf

7          Plaintiff next alleges that CCJ Defendant Gentry placed him on a nutraloaf diet as

8  punishment for behavior caused by his mental health conditions, and that he was forced to accept

9  his food with feces-covered hands and to eat it without utensils in his feces-covered cell.[3] (Pl.'s

10  Compl. at ¶¶ 107, 116-123.) While food is a basic human need protected by the Constitution, the

11  food must only be adequate to maintain health and it need not be tasty or aesthetically pleasing.

12  *LeMaire v. Maass*, 12 F.3d 1444, 1456 (9th Cir. 1993). Providing pretrial detainees food that is

13  contaminated, moldy, or otherwise inedible may constitute a violation under the Fourteenth

14  Amendment. *See Graves v. Arpaio*, 623 F.3d 1043, 1050-51 (9th Cir. 2010).

15          Defendants argue that Plaintiff was provided with edible food and items to consume the

16  food. (Defs.' Mot. at 35-36.) Defendants additionally argue that Plaintiff created the unsanitary

17  conditions he complains of and was permitted to use soap any time he asked for it. (*Id.*) Plaintiff

18  counters he was forced to eat the nutraloaf with feces-covered hands in a feces-covered room

19  because he was denied access to meal utensils. (Pl.'s Resp. at 29-30.)

20

21  [3] Plaintiff also alleges the nutraloaf caused him physical medical issues that went disregarded. (Pl.'s
Compl. at ¶¶ 107, 116-123.) Plaintiff argues that the nutraloaf left him unable to make bowel movements
22  for an extended period of time and the resulting gastrointestinal problems resulted in abdominal pain and
bloody stools. (Pl.'s Resp. at 29-30.) However, following adjudication of Defendants' previous motion
23  for judgment on the pleadings, Plaintiff's only remaining claim concerning provision of the nutraloaf
concerns whether the nutraloaf was adequate based on Plaintiff's allegations that it was served under
conditions that would contaminate it and make it inedible. (*See* R. & R. at 29-30.)

REPORT AND RECOMMENDATION - 37

1    As to Plaintiff's claim that he was forced to eat his nutraloaf without utensils and with

2    feces-covered hands, the Court finds genuine issues of material fact preclude summary judgment

3    at this stage. Here, as previously noted in relation to Plaintiff's sanitary conditions claims, the

4    Court finds there is a genuine issue of material fact regarding whether Plaintiff was actually

5    served the nutraloaf without means to clean his hands or use utensils. Therefore, the Court

6    concludes that Plaintiff's claim against Defendant Gentry, in his individual capacity, that

7    Plaintiff was forced to ingest the nutraloaf without utensils or the ability to clean his hands

8    should not be dismissed.

9    4.    Strip Search and Shackling

10    Finally, Plaintiff alleges that Defendants Gentry, Austin, Ashworth, Anderson, Plotner,

11    Schaub and Wolfe, in their individual and official capacities, subjected him to routine strip

12    searches as punishment and used leg shackles in a manner to intentionally harm him. (Pl.'s

13    Compl. at ¶¶ 13-44, 85-96.)

14    Defendants argue that the Step Program implementation of the strip searches and leg

15    shackling was warranted based on Plaintiff's behaviors while housed at CCJ. (Defs.' Mot. at 27,

16    36-37.) Defendants argue Plaintiff was not strip-searched or placed in leg restraints for punitive

17    reasons, but to protect the safety and security of the CCJ, CCJ staff, other inmates, and visitors

18    because Plaintiff had committed a major security breach by attempting to escape the facility

19    and/or introduce a weapon into the facility. (*Id.* at 27.) In the alternative, Defendants argue

20    Plaintiff fails to state a claim because any injuries Plaintiff may have suffered as a result of the

21    leg shackling were, at most, the result of negligent conduct and therefore fail to rise to the level

22    of a constitutional violation. (*Id.* at 36-37.)

23    Plaintiff argues Defendants Gentry, Austin, Ashworth, Anderson, Plotner, Schaub, and

REPORT AND RECOMMENDATION - 38

1   Wolfe violated his Fourteenth Amendment rights by conducting excessive searches and using leg

2   shackles as a form of punishment. (Pl.'s Resp. at 25-27.) Plaintiff further argues the leg restraints

3   were used in a manner to intentionally harm him and cause injury and pain. (*Id.*)

4          Here, the Court finds that Plaintiff was not strip searched or subjected to leg shackles for

5   solely punitive or retaliatory reasons. As previously documented and considered in the context of

6   Plaintiff's Fourth Amendment claims, the routine use of strip searches per Plaintiff's Security

7   Plan was reasonably implemented due to the security threat Plaintiff presented after his breach of

8   the CCJ security protocol. (*See* Pl.'s Decl. at ¶¶ 10-15, 22; Bishop Decl. at ¶ 7, Ex. A at 2-12, Ex.

9   B; Tangen Decl. at ¶¶ 3-7.) The same security concerns similarly apply to Plaintiff's need to be

10  transported in leg restraints. In addition, based on his criminal history and previous disciplinary

11  history at the CCJ, Plaintiff was subject to transport in full restraints upon his initial booking and

12  not solely because of his Security Plan. (*See* Bishop Decl. at ¶¶ 4, 6; Pl.'s Decl. at ¶ 5.)

13  Consequently, the Court finds that the CCJ's use of strip searches and leg shackling were both

14  rationally related to a legitimate governmental objective of maintaining the CCJ's institutional

15  security and were not excessive in relation to that objective.

16         Plaintiff's claim that the leg shackles were utilized in a retaliatory manner in order to

17  injure him for breaching the CCJ security protocol is also conclusory, and otherwise fails to rise

18  to the level of a constitutional violation. On October 25, 2017, Plaintiff was seen by the CCJ

19  medical staff and the staff noted that his wounds were not open, infected, or otherwise

20  significant. (*See* Bishop Decl., Ex. D at 3-4.) Plaintiff's grievance regarding this issue

21  demonstrates that he was authorized socks when the leg restraints were used and that he was

22  instructed to contact the CCJ administration if it continued to be a problem. (*See id*, Ex. E at

23  3-4.) Plaintiff did not make any further complaints about the leg shackling nor did he seek any

REPORT AND RECOMMENDATION - 39

1   additional medical attention related to the leg shackling. In any event, it appears any harm

2   resulting from the use of the shackling was, at most, negligently inflicted. *See Kingsley*, 576 U.S.

3   at 396 (finding that "liability for *negligently* inflicted harm is categorically beneath the threshold

4   of constitutional due process" (quoting *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998)

5   (emphasis in original))). As such, Plaintiff has presented no evidence, apart from his conclusory

6   assertions, that his leg shackle injuries resulted from an intended punitive or retaliatory measure.

7       Accordingly, the Court concludes that Plaintiff's claims against Defendants Gentry,

8   Austin, Ashworth, Anderson, Plotner, Schaub and Wolfe regarding the Security Plan's

9   implementation of the strip searches and leg shackling should be dismissed.

10      **D.    Qualified Immunity**

11      Defendants argue that Plaintiff's claims for damages should be dismissed because they

12  are entitled to qualified immunity. (Defs.' Mot. at 37-38.) Defendants assert that they acted

13  reasonably in light of Plaintiff's behaviors and actions after he attempted to escape the CCJ,

14  destroyed security measures in his cell, and caused multiple biohazards in his cell. (*Id.*) Plaintiff

15  counters that Defendants are not entitled to qualified immunity because the CCJ officials knew,

16  or should have known, that their conduct in relation to his claims violated his clearly established

17  rights. (Pl.'s Resp. at 36, 38.)

18      The doctrine of qualified immunity protects government officials from civil liability

19  under § 1983 if "their conduct does not violate clearly established statutory or constitutional

20  rights of which a reasonable person would have known." *Stanton v. Sims*, 571 U.S. 3, 5-6 (2013)

21  (per curiam) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). "Qualified immunity

22  gives government officials breathing room to make reasonable but mistaken judgments about

23  open legal questions" and "protects 'all but the plainly incompetent or those who knowingly

1    violate the law.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley v. Briggs*, 475

2    U.S. 335, 341 (1986)).

3        In determining whether qualified immunity applies, the Court engages in a two-step

4    process. First, the Court considers whether, taking the facts in the light most favorable to

5    plaintiff, they show that the officer's conduct violated a constitutional right. *Saucier v. Katz*, 533

6    U.S. 194 (2001). If the answer is no, then the inquiry ends there. However, if a violation could be

7    demonstrated from a view of the evidence favorable to plaintiff's position, then the question for

8    the Court is whether the right violated was so clearly established that a reasonable officer would

9    understand that his conduct violated that right. *Id.* The Court has discretion to consider these two

10   factors in reverse order, as appropriate. *Pearson v. Callahan*, 555 U.S. 223 (2009). The existence

11   of qualified immunity generally turns on the objective reasonableness of the actions, without

12   regard to the knowledge or subjective intent of the particular official. *Harlow v. Fitzgerald*, 457

13   U.S. 800, 819 (1982).

14       When addressing qualified immunity on summary judgment, the Court "may not resolve

15   genuine disputes of fact in favor of the [moving] party" and must view the evidence in the light

16   most favorable to the non-movant. *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (per curiam). But

17   where there are disputed factual issues that are necessary to a qualified immunity decision, these

18   issues must first be determined by the jury before the court can rule on qualified

19   immunity. *Morales v. Fry*, 873 F.3d 817, 824 (9th Cir. 2017); *see also Nehad v. Browder*, 929

20   F.3d 1125, 1140 (9th Cir. 2019). Consequently, if there is a genuine issue of material fact

21   concerning both: (1) whether it would be clear to a reasonable officer that their conduct was

22   unlawful under the circumstances they confronted, and (2) whether the defendant's conduct

23   violated a constitutional right, then summary judgment granting qualified immunity is not

1  appropriate. *Bonivert v. City of Clarkston*, 883 F.3d 865, 871-72 (9th Cir. 2018); *see also*

2  *Serrano v. Francis*, 345 F.3d 1071, 1077 (9th Cir. 2003).

3          Here, as to Plaintiff's: (1) Fourth Amendment claims; (2) Fourteenth Amendment claims

4  for denial of exercise and recreation time; and (3) Fourteenth Amendment claims regarding the

5  routine use of strip searches and leg shackling, a qualified immunity analysis is not required

6  because the Court has determined Plaintiff failed to demonstrate a violation of his constitutional

7  rights. However, at this stage, it is unclear whether qualified immunity shields Defendants from

8  liability as to Plaintiff's remaining Fourteenth Amendment claims regarding sanitary conditions

9  and the provision of the nutraloaf as it is unclear whether the Defendants' conduct violated

10  Plaintiff's constitutional rights or whether it would have been clear to a reasonable officer that

11  their conduct was unlawful under the circumstances. *See Bonivert*, 883 F.3d at 871-72 (Where a

12  "genuine issue of material fact exists that prevents a determination of qualified immunity at

13  summary judgment, the case must proceed to trial.").

14          Because the Court has determined that genuine issues of material fact exist in regard to

15  Plaintiff's remaining claims regarding sanitary conditions and the provision of the nutraloaf, the

16  Court declines to recommend granting qualified immunity to Defendants Gentry, Dougher, and

17  Plotner on summary judgment as to these claims.

18                          **IV.    CONCLUSION**

19          For the foregoing reasons, this Court recommends Defendants' Motion (dkt. # 44) be

20  GRANTED in part and DENIED in part as follows:

21          The Court recommends that Plaintiff's: (1) First Amendment claims; (2) Fourth

22  Amendment claims against Defendants Tangen, Barnett, and Bishop, in their official capacities;

23  (3) visitation rights claims against all Defendants, save for Defendant Gentry in his official

capacity; (4) exercise and recreation claims, save for Defendant Gentry in his individual and official capacity; (5) claims related to oral hygiene and shaving materials; (6) sanitary conditions claims against all Defendants, save for Defendants Gentry, Plotner, and Dougher, in their individual capacities; (7) claims related to access to bedding and clothing; (8) mental health treatment claims against all Defendants, save for Defendants Gentry, Plotner, and Dougher, in their individual capacities; (9) nutraloaf claims against all Defendants, save for Defendant Gentry in his individual capacity; (10) strip search and leg shackle claims against Defendants Tangen, Barnett, and Bishop, in their official capacity; (11) Fourteenth Amendment Equal Protection Clause claims; (12) Washington state law tort claims; and (13) claims for injunctive relief, and that these claims all be dismissed with prejudice as Plaintiff failed to amend his complaint to correct deficiencies previously identified with respect to these claims.

The Court recommends that Defendants' Motion be GRANTED as to Plaintiff's: (1) visitation rights claim against Defendant Gentry, in his official capacity; and (2) mental health treatment claims against Defendants Gentry, Plotner and Dougher, in their individual capacities, and that these claims be dismissed without prejudice for failure to exhaust. The Court further recommends that Defendants' Motion be GRANTED as to Plaintiff's: (1) Fourth Amendment Claims against Defendants Gentry, Austin, Ashworth, Anderson, Plotner, Schaub and Wolfe, in their individual and official capacities; (2) exercise and recreation claims against Defendant Gentry, in his individual and official capacity; and (3) strip search and leg shackle claims against Defendants Gentry, Austin, Ashworth, Anderson, Plotner, Schaub and Wolfe, in their individual and official capacities, and that these claims be dismissed with prejudice.

Finally, the Court recommends that Defendants' Motion be DENIED as to Plaintiff's Fourteenth Amendment claims regarding: (1) the unsanitary conditions of his cell alleged against

Defendants Gentry, Plotner, and Dougher, in their individual capacities; and (2) the nutraloaf

claim alleged against Defendant Gentry, in his individual capacity. A proposed Order

accompanies this Report and Recommendation.

Objections to this Report and Recommendation, if any, should be filed with the Clerk and

served upon all parties to this suit by no later than **twenty-one (21)** days after the filing of this

Report and Recommendation. Failure to file objections within the specified time may affect your

right to appeal. Objections should be noted for consideration on the District Judge's motion

calendar **fourteen (14)** days after they are served and filed. Responses to objections, if any, shall

be filed no later than **fourteen (14)** days after service and filing of objections. If no timely

objections are filed, the matter will be ready for consideration by the District Judge on

**September 10, 2021**.

The Clerk is directed to send copies of this Report and Recommendation to the parties

and to the Honorable Benjamin H. Settle.


Dated this 18th day of August, 2021.


MICHELLE L. PETERSON
United States Magistrate Judge